722 F.Supp. 568 (1989)
Donnell R. MATTINGLY, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. 86-2202C(1).
United States District Court, E.D. Missouri, E.D.
October 10, 1989.
John Sullivan, St. Louis, Mo., for plaintiff.
Philip L. Sbarbaro, Office of Special Litigation, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
Donnell R. Mattingly, plaintiff, filed the instant action against the United States seeking the refund of payments made to the Internal Revenue Service ("IRS") in March of 1986. Plaintiff made said payments in partial satisfaction of assessments made against him for alleged violations of §§ 6700 and 6701 of the Internal Revenue Code. 26 U.S.C. §§ 6700 and 6701.
Specifically, the IRS assessed penalties against plaintiff of $28,775 for the 1982 calendar year, $25,200 for the 1983 calendar year and $8,000 for the 1984 calendar year for plaintiff's participation in selling interests in abusive tax shelters, in violation of § 6700. In addition, the IRS assessed penalties against plaintiff of $40,000 for the 1982 calendar year and $58,000 for the 1983 calendar year for plaintiff's aiding *569 and abetting in the understatement of tax liability of other individuals, in violation of § 6701. Plaintiff's March, 1986, payments totaled $750, $450 of which was applied towards the assessments under § 6700 and $300 of which was applied towards the assessments under § 6701. Plaintiff claims that he is entitled to a refund of the $750 paid to the IRS because he furnished no "gross valuation overstatement" during the periods in question. Because a "gross valuation overstatement" is necessary to establish liability under §§ 6700 and 6701 of the Internal Revenue Code, plaintiff argues that he is not liable for penalties under these provisions and that he is, therefore, entitled to a refund for the payments he has made thus far. In addition, plaintiff asserts that if the Court finds that the tax shelters which plaintiff promoted were, in fact, abusive, plaintiff should not be held liable because he had no knowledge of their abusive nature. The government has filed a counterclaim seeking the unpaid balance of assessments made against plaintiff. The parties have stipulated that if plaintiff is found to be liable, the applicable penalty will be 10 percent of the income that plaintiff received from his abusive tax shelter activities, in accordance with the Fourth Circuit's decision in Spriggs v. United States, 850 F.2d 690 (4th Cir.1988).
This matter is now before the Court on the parties' cross motions for partial summary judgment. The parties only seek summary judgment on the issue of plaintiff's liability under § 6700. The government concedes that § 6701 contains a knowledge requirement, which renders the government's claims under that provision ill-suited for resolution on a motion for resolution on a motion for summary judgment. The Court will outline below the facts surrounding plaintiff's involvement in the promotion of allegedly abusive tax shelters.

FACTS
Plaintiff and a Mr. Tom Sommers formed S & M Investment Co. ("S & M") to market the American Educational Leasing ("AEL") and American Videogame Leasing ("AVL") tax shelters. S & M was a regional distributor for the shelters. Plaintiff was president and treasurer of S & M and was responsible for distribution of brochures regarding the shelters. Plaintiff also conducted a tax preparation service.

The AEL Shelter
The AEL shelter worked as follows: An investor would lease an audio tape master that was suitable for reproduction from AEL for an initial payment of $9,500. The investor was entitled to reproduce the tape and market the copies, provided that AEL received fifty percent of the revenue that the investor received from the marketing of copies. The investor would also pay $1,500 to a distribution company to market each tape.
The "shelter" aspect of the program came into effect when AEL agreed to pass investment tax credits through to the investor. Under 26 U.S.C. § 46(a) and (b)(1), ten percent of a "qualified investment" may be claimed as an investment tax credit. Under 26 U.S.C. § 48(d)(1), the lessor of certain property may elect to treat the lessee as having acquired such property for an amount equal to the fair market value of such property. Thus, under § 48(d)(1), the lessor of property can "pass through" to the lessee investment tax credits to which the lessor would otherwise be entitled under § 46. Under the program, AEL assumed the status of the "lessor". AEL would "purchase" a tape by drafting a note in favor of one International Horizon, Inc., for $165,000. AEL would thus assume the status of the lessor, which would entitle AEL to a ten percent investment credit  $16,500. AEL would then "lease" the tape to the investor for $9,500, and, in return, AEL's investment credit of $16,500 would be passed through to the investor. In addition, the investor was informed that he could deduct up to fifty percent of the lease payment and the entire $1,500 distribution fee.

The AVL Shelter
The AVL shelter worked in a similar fashion to the AEL shelter, although the AVL investors were limited partnerships and S corporations. AVL would "purchase" *570 masters of videogames suitable for reproduction from Dunhill Electronics by drafting notes in favor of Dunhill for amounts ranging from $400,000 to $800,000. AVL would then "lease" the master to an investor for between $19,000 and $35,000, and the investor was obligated to pay AVL a percentage of its profits from the distribution of copies to AVL. In addition, the investor would pay $2,500 to a distribution company and $2,500 to A & M to prepare the investor's tax returns for the next seven years. In return, AVL would pass along its investment credit of between $40,000 and $80,000 to the investor. As with the AEL investors, the AVL investor was told that he could deduct up to fifty percent of the lease payment and fees.
S & M would contact investors for both the AEL and the AVL shelters through plaintiff's tax preparation service, through referrals by third parties whom S & M subcontracted for such purposes and through plaintiff's participation in sales meetings. Plaintiff provided prospective investors with brochures on the tax shelter programs and explained the tax benefits, including calculation of the investment credit. Plaintiff assisted numerous individual and corporate investors in obtaining AEL and AVL leases and prepared tax returns for many of the investors, wherein he claimed tax benefits in accordance with the respective tax shelter program.

PARTIES' ARGUMENTS
Defendant argues that plaintiff is subject to liability under 26 U.S.C. § 6700 for furnishing "gross valuation overstatements" in connection with plaintiff's assistance in the organization or participation in the sale of the AEL and AVL shelter programs. Section 6700 provides in pertinent part:
(a) Imposition of penalty. Any person who 
(1)(A) organizes (or assists in the organization of)
(i) a partnership or other entity,
(ii) any investment plan or arrangement, or
(iii) any other plan or arrangement, or
(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and
(2) makes or furnishes (in connection with such organization or sale) 
(B) a gross valuation overstatement as to any material matter,
shall pay a penalty equal to the greater of $1,000 or 20 percent of the gross income derived or to be derived by such person from such activity.[1]
Section 6700(b)(1) defines any statement as to the value of any property or services as a "gross valuation overstatement" if "the value so stated exceeds 200 percent of the amount determined to be the correct valuation", and "the value of such property or services is directly related to the amount of any deduction or credit allowable under chapter 1 to any participant". 26 U.S.C. § 6700(b)(1).
Defendant argues that plaintiff's organizational and sales roles in connection with the shelter programs are indisputable. Defendant further notes that plaintiff has admitted that the tapes and videogames which were "sold" and "leased" in connection with the AEL and AVL programs were overvalued in excess of 200 percent of the fair market value. Thus, defendant argues, defendant must only show that plaintiff furnished these gross valuation over-statements in connection with the organization and sale of the shelter programs in question. Defendant concludes that by furnishing offering material for AEL and AVL that contained gross valuation overstatements regarding the value of audio and video master tapes, plaintiff engaged in the type of activity that establishes liability under § 6700.
Plaintiff argues that the promotional brochures that he distributed for AEL and *571 AVL did not contain gross valuation overstatements within the meaning of § 6700(a)(2)(B). Rather, plaintiff's position is that the statements in the brochures were "indications that sample tapes had produced cash and promissory note payments together with appraisals which substantiated an approximate value of the proposed lease". Plaintiff claims that when investors signed a lease and paid, the tapes were not in existence and that AEL and AVL only signed promissory notes for the master tapes after an investor signed the lease and paid in full. AEL and AVL would then furnish appraisals of the tapes, plaintiff claims, to substantiate the value of the notes and the investor's purchase price.
Plaintiff argues that the investment credit had to be based upon the promissory note. Thus, plaintiff concludes, because an investor could not base his investment credit upon the brochure, the statements in the brochure could not be "valuation statements". Plaintiff further argues that the statements in the brochures were mere "puffing" and that because the tapes were not yet in existence when the brochures were distributed, it would be impossible to provide a valuation statement at that time.
This Court rejects plaintiff's contention that a statement as to value cannot be provided for property that does not exist. Clearly § 6700 is not concerned with whether a statement as to value can be made accurately. Rather, § 6700 imposes a penalty on any person who provides a "gross valuation overstatement". The plain language of the statute applies to statements as to the value of property that are purely prospective. If a person makes a representation relative to the value of property, regardless of whether that representation is an estimate or speculative, the representation falls within the language of § 6700(b)(1)(A) if the represented value exceeds "200 percent of the amount which is determined to be the correct valuation". 26 U.S.C. § 6700(b)(1)(A) (emphasis added). Clearly whether property exists or whether a valuation can actually be rendered at the time the representation is made is inconsequential. The fact that the statement was made and that it exceeds the correct value by 200 percent is all that is relevant under § 6700(b)(1)(A).
The definition of a "gross valuation overstatement", however, is twofold. Under § 6700(b)(1), the stated value of the property or services must exceed the correct valuation by 200 percent and said value must be "directly related to the amount of any deduction or credit allowable under chapter 1 to any participant". 26 U.S.C. § 6700(b)(1)(B). Thus, the dispositive question in the case at bar is whether the investment credit that the investors which plaintiff solicited received was based upon the statements in the brochures or some other representation as to value. If the investment credits were based upon some representation that plaintiff did not make or provide in the offering literature, then he could not be said to have provided "gross valuation overstatements", because the statement as to value would not be "directly related to the amount" of the investment credit as required by § 6700(b)(1)(B).
The AEL and AVL brochures make repeated references to the price for which AEL and AVL would purchase the tapes. In addition, the investment credit that an investor would receive was set forth in the offering brochures, and the amount of this credit was clearly based upon AEL or AVL's purchase price. Plaintiff does not suggest that AEL or AVL ever executed a promissory note for less than the amount set forth in the brochures. Rather, it appears AEL or AVL's purchase price, as well as the investment tax credit, was, in effect, guaranteed. Hence, the value of the promissory note was predetermined.
It is quite clear from the brochures that the statements as to AEL or AVL's purchase price for the tapes are "statement(s) as to the value" of the tapes within the meaning of § 6700(b)(1). The fact that later appraisals were provided to investors does not affect the Court's conclusion. The language of the brochures and plaintiff's description of the AEL and AVL programs confirm that the later appraisals *572 were provided only to substantiate the representations as to value that were set out in the brochures. The appraisals did not ultimately alter the amount of the promissory note or the investment credit.
Furthermore, it was upon the representations as to purchase price that an investor's tax credit was based. The purchase price was established before the tapes were made and before the promissory notes were executed. Indeed, for all practical purposes the brochures "guaranteed" the amount of the promissory note, because the investor was promised a specified investment tax credit for each tape purchased under the program. Plaintiff cannot avoid the reality of the AEL and AVL programs by arguing that the promissory notes were executed sometime after his involvement in the program ceased. This Court concludes that the investment tax credits were based upon the representations contained in the brochures as to purchase price and that said representations were "statement(s) as to value". Therefore, because plaintiff concedes that the representations in the brochures as to the purchase price exceeds 200 percent of the tapes' correct valuation, and because plaintiff distributed these brochures in connection with the sale of the AEL and AVL programs, this Court concludes that plaintiff is liable under 26 U.S.C. § 6700 for providing "gross valuation overstatements". As the parties have stipulated that the penalty under § 6700 in this case is $6,197.50, the Court will deny plaintiff's motion for partial summary judgment and grant defendant's motion for partial summary judgment in the amount of $6,197.50.
NOTES
[1] 26 U.S.C. § 6700(a) was amended in 1984 by Pub.L. 98-369, which substituted "20 percent" for "10 percent".